IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| PMJ BLEU TERRE MANAGEMENT, LLC, | § § § | |
| *Plaintiff,* | § § | SA-22-CV-00166-FB |
| vs. | § § § | |
| AMTRUST INSURANCE COMPANY OF KANSAS, INC., | § § § | |
| *Defendant.* | § § | |

## ORDER

Before the Court in the above-styled cause of action are Defendant AmTrust Insurance Company of Kansas, Inc.'s Motion to Strike Opinions and Testimony of Plaintiff's Expert John McIntyre [#19] and Defendant AmTrust Insurance Company of Kansas's Inc.'s Motion to Strike Opinions and Testimony of Plaintiff's Expert Mark Earle [#20].  This case was referred to the undersigned for all pretrial proceedings on February 28, 2022.  The undersigned therefore has authority to issue this non-dispositive order pursuant to 28 U.S.C. § 636(b)(1)(A).

The Court held a hearing on the motions on January 18, 2023, at which counsel for both parties appeared via videoconference.  After considering the motions, the parties' responses and replies [#23, #24, #26], the arguments at the hearing, and the governing law, the Court will deny the motions.

## I.  Background

This is a first-party insurance dispute arising out of alleged damage to a commercial property located at 3503 Crosspoint, San Antonio, Texas 78217 ("the Property") from a wind and hailstorm.  Plaintiff PMJ Bleu Terre Management, LLC ("PMJ") is the named insurer under

1

a commercial property insurance policy, PP1058597-00 ("the Policy"), issued by Defendant AmTrust Insurance Company of Kansas, Inc. ("AmTrust").  The Policy insures the Property against losses from storm damage, among other things, and was in effect from July 31, 2020, to July 31, 2021.  PMJ's Original Petition alleges that a wind and hailstorm caused extensive damage to the Property's roofing system, HVAC systems, and exterior and interior on or about May 3, 2021, a date during the policy period.  (Orig. Pet. [#1-4], at ¶ 9.)  PMJ filed a claim with AmTrust for the damage, and the parties disagreed as to the timing and scope of the damage.  AmTrust denied the claim, finding that the hail damage identified on the Property predated the policy period by a couple of months and therefore fell outside of the scope of coverage.  (*Id.* at ¶ 15.)  PMJ filed this suit, alleging claims for breach of contract and extracontractual violations of the Texas Prompt Payment of Claims Act and Texas Deceptive Trade Practices Act.  (*Id.* at ¶¶ 29–39.)

AmTrust has moved for summary judgment, arguing that PMJ cannot prove that the damage to the Property resulted from a hailstorm occurring during the policy period, meaning its breach of contract claim fails as a matter of law.  AmTrust further argues that because PMJ's breach of contract claim fails, AmTrust has no liability for PMJ's extracontractual claims because PMJ does not assert an independent injury for these claims.  AmTrust has also filed the two motions to strike currently before the Court.  AmTrust asks the Court to strike the proposed opinions and testimony of PMJ's expert engineer, John McIntyre, and public adjuster, Mark Earle.  The motions to strike are ripe for review and are addressed herein.  The undersigned will issue a separate report and recommendation on the motion for summary judgment with a recommendation to the District Court.

## II.  Motions to Strike

Both of AmTrust's motions arise under the standards set forth in Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993).  In *Daubert*, the Supreme Court held that trial judges must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.  Subsequent to *Daubert*, Rule 702 of the Federal Rules of Evidence was amended to provide that a witness "qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  *See Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting Fed. R. Evid. 702).  The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  When expert testimony is challenged under *Daubert*, the burden of proof rests with the party seeking to present the expert testimony.  *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998).

Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that: (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable.  *See id.* at 276; *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997).  Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Adv. Comm. Notes (2000).  *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."  *Id.* (quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996)).  "Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III. Analysis

AmTrust has moved to exclude the testimony of two experts for Plaintiff, engineer John McIntyre and public adjuster Mark Earle. Because Plaintiff has met its burden to demonstrate both experts are qualified and used sufficiently reliable methodologies, and because AmTrust's criticism of these experts' opinions can be adequately addressed through vigorous cross examination and the introduction of contradictory evidence, AmTrust's motions are denied.

**A.   John McIntyre**

The motion to strike PMJ's expert engineer, John McIntyre, is denied. PMJ designated Mr. McIntyre as a retained expert. (Expert Designation [#19-1], at 3.) Mr. McIntyre is a registered professional engineer in Texas with 43 years of experience in engineering generally and significant experience in the area of building inspection and assessment of water, wind, tornado, and hail damage. (*Id.*; Qualifications [#19-1], at 31–32.) PMJ's expert designation indicates that McIntyre intends to testify that the damage to the Property was the result of hail impact during the policy period. (Expert Designation [#19-1], at 3.)

The record reflects that McIntyre inspected the roof on January 4, 2022. McIntyre issued a roof report on March 8, 2022. (Roof Report [#19-1], at 8–27.) The report identifies the date of loss as May 3, 2021, the alleged date of loss in the Original Petition. (*Id.* at 11.) According to the report, baseball sized hail was reported across San Antonio on this date, along with high winds and tornadoes. (*Id.*) McIntyre testified in his deposition that this conclusion was based on

a hail history report by Stormersite (a weather reporting site), as well as references to other news sources and weather reports from that date. (McIntyre Dep. [#19-1], at 49–50.)

The report describes the roof of the Property as a spray polyurethane foam roof (SPF) with a weather resistant coating on top of the SPF installed in 2017. (Roof Report [#19-1], at 12.) At the time of inspection, McIntyre observed numerous dents, cuts, and breaches to the roof surface. (*Id.* at 12–13.) McIntyre took moisture readings of the SPF in various places on the roof and found 40% to 60% moisture content in the foam. (*Id.*) He also documented dents in the HVAC coils of the rooftop units and dents in ground-mounted AC units and considered a roof core sampling test previously performed by Jamie Wesselski, public adjuster, as part of a loss estimate performed in July 2021, which revealed 61% moisture content. (*Id.* at 13.) McIntyre also reviewed interior photographs taken by Wesselski showing water stains on roof beams and ceiling stains, and a Property Condition Assessment Report dated July 20, 2020, prepared by Property Condition Assessment Consultants, Inc., which was based on an inspection of the entire property on July 1, 2020.[1] (*Id.* at 10, 13.) He did not himself inspect the interior of the building. (McIntyre Dep. [#19-1], at 59.)

The roof report concludes that the SPF is saturated with excessive moisture throughout the roof and that the San Antonio Building Code will not allow re-coating of the existing roof but requires complete roof removal and replacement. (Roof Report [#19-1], at 13.) McIntyre also finds that replacement of the flashing of the roof and aspects of the interior (ceilings, carpets, and batt insulation under the roof deck) will require removal and replacement as well. (*Id.* at 15.)

McIntyre issued a supplemental report on July 10, 2022, to address the finding of Plaintiff's "weather expert," Greg Degeyter, that hail did not strike the Property on May 3, 2021,

---

[1] The McIntyre report mistakenly refers to the property condition assessment as dated July 20, 2021.

the alleged date of the storm causing the damage at issue and the date referenced in McIntyre's original roof report. (Supplemental Report [#19-1], at 28–30.) Degeyter's analysis found that hail struck the Property on April 28, 2021, based on radar return echoes. (*Id.* at 29; McIntyre Dep. [#19-1], at 49.) McIntyre states in his supplemental report that he intends to defer to Degeyter's knowledge of meteorology for the date of hail damage at the Property. (*Id.*) He further notes that the exact date of the hail damage does not change the opinion in his original report, as there is ample evidence of hail damage on the roof, breaches in the roof surface coat, and the roof assembly is saturated in many locations across the roof. (*Id.*)

AmTrust moves to strike McIntyre's proposed opinions for lack of reliability; AmTrust does not challenge McIntyre's qualifications or the relevance of his opinions as to the claims at issue. AmTrust's reliability challenge is threefold. AmTrust contends that McIntyre's opinion that the entire roofing system is saturated with water as a result of hail damage lacks methodology and is based on insufficient facts and unsupported assumptions; his opinion on the timing of the hail damage lacks foundation and is based on unreliable information and speculation; and his opinion regarding the cause of interior water damage lacks foundation, methodology, and is based on speculation. The Court will deny the motion, as PMJ has satisfied its burden to establish the reliability of McIntyre's opinions, and AmTrust's concerns about his testimony can be addressed adequately through cross-examination.

First, as to the saturation of the roofing system, McIntyre's opinion is based on his firsthand observation of damage to the roof, performance of six 10x10-foot hail test squares on the roof, verification of observations against SPF Alliance guidelines for assessing hail damage, and the review of photographs of core roof sample tests by Wesselski and his photos of interior leaks. McIntyre also used a non-destructive moisture meter to obtain measurement of the

moisture content at the various breaches in random areas of the entire roof. AmTrust points out that this was only the second SPF roof that McIntyre has inspected in his career. (*See* McIntyre Dep. [#19-1], at 57.) But that does not on its own render his opinion unreliable. McIntyre testified in his deposition that utilizing a moisture meter to test saturation of the roof is an accepted practice in the industry. (McIntyre Dep. [#19-1], at 67.)

Second, as to the timing of the hailstorm, McIntyre's opinion does not depend on a precise date of hail damage; he only intends to testify that the damage occurred within the policy period, sometime between July 31, 2020, to July 31, 2021. McIntyre's opinion that the storm occurred during the policy period is based on a review of the meteorology expert report of Degeyter, independent verification of the April 28, 2021 hailstorm through the National Oceanic and Atmospheric Administration's (NOAA's) database, a review of the July 20, 2020 Property Condition Assessment (which was nine days before the beginning of the policy period), and corresponding photos of the same rooftop units demonstrating no dents in the roof and coils. (*See* McIntyre Dep. [#19-1], at 90; Property Condition Assessment [#23-4], at 11–41.) Importantly, the July 20, 2020 Property Assessment does not contain any reference to roof leaks or hail damage to the roof or roofing unit coils and reports the roof being in good condition. (*Compare* McIntyre Report [#23-2], at 61 *with* Property Condition Assessment [#23-4], at 19, 61.) McIntyre reasonably relied on this report in concluding that if the roof was damaged prior to the policy period, there would be damage recorded in the July 20, 2020 report.

Finally, as to the cause of the interior water damage, McIntyre's opinion is not rendered unreliable solely by the fact that he did not personally inspect the interior of the Property and relied on photographs from the public adjuster. Furthermore, McIntyre testified that he had ruled out other possible causes of the interior water damage, such as condensation, because the HVAC

drainage system is located on the roof, not through the interior, and therefore the failure would have to be at the roof level. (McIntyre Dep. [#19-1], at 62.) In summary, PMJ has established the reliability of McIntyre's opinions as to the extent and timing of the hail damage to the Property at issue, and AmTrust's motion is denied.

**B.     Mark Earle**

The Court will also deny the motion to strike Mark Earle. PMJ designated Earle, a building consultant and public adjuster, as a retained expert to testify primarily on claims handling issues. (Expert Designation [#19-1], at 4–5.) Earle is a licensed adjuster in Texas, Louisiana, Florida, Oklahoma, South Carolina, North Carolina, and Georgia and has 16 years of experience as an independent adjuster for over 27 insurance carriers and has personally handled over 20,000 claims as a desk and field adjuster, including hail claims. (Expert Report [#21], at 70.) The expert designation for Earle indicates he intends to testify as to the following: (1) PMJ reported its loss in a timely manner and complied with all requests made by the insurer; (2) AmTrust performed a substandard investigation of the claim, unreasonably delayed considering the claim, and wrongfully denied the claim; (3) the cost to repair the roofing system and interior and exterior elevations is $1,324,355.66; and (4) the storm damage was likely caused by an April 28, 2021 storm during the policy period. (Expert Designation [#19-1], at 4–5.)

AmTrust asks the Court to strike Earle's opinions on the timing of the hailstorm on the basis that he is not qualified to provide such testimony and his opinions are unreliable. AmTrust also argues that, although Earle is qualified to testify on the claims handling process, his opinions on this topic are unreliable.

**Claims Handling.** First, PMJ has satisfied its burden to establish that Earle's testimony on the claims-handling process is reliable. In reaching his opinions on claims handling, Earle

8

reviewed the insurance policy, AmTrust's claim notes, correspondence among the adjusters on the claim, damage estimates and reports of the adjusters, the reports of other designated experts, the Property Condition Assessment report from July 2020 (the report referenced in the analysis above regarding the to the motion to strike McIntyre), records regarding the replacement of the Property's roof in September 2017, and the Sedgwick invoice and activity log dated September 2021 regarding the investigation of the claim. (Earle Expert Report [#24-1], at 2–3.) Earle also personally inspected the Property and prepared an estimate of damages. (Earle Dep. [#21], at 138.)

Earle's ultimate conclusion regarding claims handling is that AmTrust performed a "substandard investigation of the claim which resulted in a gross underpayment of the covered damages." (Earle Expert Report [#24-1], at 9.) This conclusion is based on Earle's finding that the claim file suggests that the field and desk adjuster "had every intention to pay" the covered loss during the pendency of the claim but reversed their decision for "unclear" reasons. (*Id.*) Additionally, Earle found that AmTrust was provided clear documentation that indicates the roof was replaced in 2017, yet the adjuster did not change his position and "continued to claim in his report that the roof was damaged by a 2016 hail event," which resulted in an "improper coverage determination." (*Id.*)

AmTrust argues that Earle's opinions on the claims handling process should be stricken because his opinions are based on incorrect facts and assumptions, i.e., a flawed methodology. AmTrust argues Earle should have reviewed deposition testimony taken in the case; should have spoken personally to Deniece Dorsey (AmTrust's desk adjuster), Robert Puga (the independent adjuster assigned the claim investigation on AmTrust's behalf), and Wesselski; and should have considered additional correspondence between these individuals in his timeline of AmTrust's

handling of the claim. These are all issues best explored on cross examination and do not merit exclusion of Earle's expert testimony on claims handling.

The record reflects that Puga inspected the Property on May 26, 2021, and made an initial recommendation to Dorsey on June 16, 2021, that $250,000 in reserves be set aside to cover the loss. (Correspondence [#21], at 13.) Earle states in his report that based on his experience and expertise, it would be typical to recommend reserves in the amount of $0 if the loss was not going to be covered. (Earle Expert Report [#24-1], at 6.) Then on July 15, 2021, Puga submitted a report to AmTrust revising the roof replacement estimate to $134,111.20. (Puga Report [#21], at 31–35.) In this report, Puga suggests that a hail event did not occur on the alleged date of loss—May 3, 2021—and references three hail events from 2016 and one hail event from May 27, 2020 (all of which predate the policy period) as the source of the damage. (*Id.* at 33.) The report states that the "most damage hail [sic] likely occurred on April 12, 2016 which yielded hail 1.5" in diameter." (*Id.*) (The errors in this sentence make its meaning ambiguous to the Court.) The report also indicates that at the time of the report the "coverage investigation [was] still in progress." (*Id.*) On this same date, Dorsey emailed a status update to PMJ's representative, apologizing for the delay and stating that Puga had confirmed "there is hail damage to the roof and a payment recommendation will be included with the report." (Claim Notes [#24-3], at 4.)

The following day, Wesselski provided Dorsey with the July 2020 Property Condition Assessment and evidence of roof replacement in September 2017, which in his opinion ruled out any possibility that the hail damage occurred in 2016. (Correspondence [#21], at 111.) Dorsey responded that she agreed that the roof replacement invoice date eliminated the April 12, 2016 hail event but found the July 2020 assessment to be inconclusive in light of the lack of photos or

a more detailed description of the roof condition.  (*Id.*)  There was additional correspondence between Dorsey and Wesselski on July 26, 2021, in which Wesselski reiterated his belief that the hail damage occurred during the policy period and asked Dorsey to not submit her denial letter until they "get this figured out."  (*Id.* at 113–14.)  Despite these communications, Dorsey submitted a letter to PMJ's representative on September 15, 2021, stating that the claim was still under review, but AmTrust had been unable to determine that the hail damage occurred during the policy period and based on weather reports, there were no hailstorms at the Property during that time.  (Ltr. [#24-6], at 2–3.)  The letter requested information and documentation supporting the claim that hail damage occurred during the policy term.  (*Id.*)

According to Sedgwick's records, on September 29, 2021, Puga authored a second report summarizing communication with Wesselski and Dorsey and proposing a plan of action to complete the investigation.  (Sedgwick Records [#24-2], at 4.)  (The Court could not locate the second Puga report itself in the record, and so relies on the descriptions of it that are in the record.)  Earle states in his expert report that this second report by Puga ignores the documentation showing that the roof was replaced in 2017 and again opines that the hail damage was a result of an April 2016 hail event.  (Earle Expert Report [#24-1], at 8.)

This record does not demonstrate that Earle's opinions were based on a flawed methodology due to Earle's failure to consider certain evidence or to speak personally to other witnesses before rendering his opinion.  As PMJ points out in its response to AmTrust's motion, Earle could not have reviewed the deposition transcripts before issuing his expert report, as Puga's and others' depositions were taken months after the report was issued.  That said, Puga's deposition testimony is favorable to AmTrust's interpretation of the evidence; Puga testified that he never intended to communicate that he believed the damage was caused by an April 2016 hail

11

event but rather that both he and Dorsey consistently communicated to PMJ that the claim remained under investigation due to lack of evidence of a hailstorm during the policy period. (Puga Dep. [#21], at 25.) This is a fair reading of the communications and reports in evidence, but it is not the only reading. That Earle read the communications differently does not render his opinion unreliable. AmTrust may cross examine Earle with Puga's testimony.

As to Earle's failure to speak personally to Puga, Dorsey, and Wesselski, AmTrust does not cite any authority that an expert witness must personally interview witnesses to render a reliable opinion on claims handling. The Court declines to exclude Earle on this basis. Finally, Earle's opinion is not unreliable because he does not refer to the July 26, 2021 communications between Dorsey and Wesselski in his expert report or Dorsey's September 15, 2021 letter to PMJ's representative requesting more information. This is additional fodder for cross examination and also supports AmTrust's position that the claim was still in process and that it did not mislead or mishandle the claim, but rather was attempting to identify a possible source of the hail damage during the policy period.

**Opinion on Cause of the Damage.** Earle is also qualified to testify as to the cause of damage to the Property. In reaching his conclusion that the hail damage occurred during the policy period, Earle independently reviewed the NOAA storm report for the period from April 28, 2021, to May 1, 2021, which unequivocally indicates the Property location in its swath map of large 6.4 inch hail during the storm period. (Expert Report [#21], at 71.) Earle also reviewed multiple historical weather reports from additional sources, Degeyter's expert report on the timing of the hail damage, and McIntyre's report. (*Id.*) Earle's opinions on the timing of the storm are also sufficiently reliable for the same reason McIntyre's are.

In summary, the Court will deny both motions to strike and permit McIntyre and Earle to testify as to the opinions contained in their expert reports. AmTrust may cross examine both experts on the issues raised in its motions. Of course, nothing in this order prevents AmTrust from filing motions in limine with regard to particular aspects of anticipated testimony by either expert or from objecting to their testimony at trial.

**IT IS HEREY ORDERED** that Defendant AmTrust Insurance Company of Kansas, Inc.'s Motion to Strike Opinions and Testimony of Plaintiff's Expert John McIntyre [#19] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant AmTrust Insurance Company of Kansas's Inc.'s Motion to Strike Opinions and Testimony of Plaintiff's Expert Mark Earle [#20] is **DENIED**.

SIGNED this 5th day of April, 2023.

_____
ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE